Madam Clerk, please call the first case of the afternoon. 114-0390, Donna Halters v. Dino Halters Counsel, you may approach and begin. May it please the Court, Richard Baum, Baum, Rafa and Marzal, for Donna Halters. Forgive my voice. Counsel, I would ask for a few minutes rebuttal if possible. You have five minutes in reply. Thank you. Is that in addition, Judge? In addition to 15? Yes, you have 15 now. Five minutes to reply after the response. Thank you, Judge. This is a 19-H petition concerning cases by Donna Halters for injuries that occurred between 1997 and the year 2000. There were four cases filed. Three of them resulted in awards of permanent partial disability. They ranged from an injury to the shoulder, which resulted in a 30% disability, permanent partial disability, to the right shoulder, to the right leg, which resulted in a 25% disability to the right leg, and 25% as a whole for two herniated discs, one in the cervical region and one in the lumbar region. Thereafter, the trials, Donna Halters returned to work. She was a road repair person, a laborer who worked repairing the roads in the city streets. Counsel, can I ask a question that kind of troubled me in this case? She filed a 19-H petition. What year did she file the 19-H petition? Yes, Judge. What year was it? Do you know? 2004. And when was it heard? 30 months of the year. When was it heard? When was it heard? It was heard in 2012. And why would it take eight years to get a 19-H petition heard? Because she was treating continuously and we kept waiting for something to happen where she might be released. Her treating doctor never released her to return to work. She was also receiving benefits during most of that time. What did that have to do with 19-H? 19-H is her condition at the time of filing entitles her to more benefits than she was entitled to under the original hearing. Yes, Judge. I don't understand this. In April of 2002, just two years before the filing, she had a cervical fusion by Dr. Howard Ahn at Rush Press. And in 2003, she had surgery on her left shoulder by Dr. Guido Mera. And in 2004, at the time of the filing, she had a nucleoplasty at L3, L4, L5 by Dr. Alberto. So there were substantial surgeries prior to filing the 19-H. Well, I understand that. And so either she was entitled to 19-H relief when it was filed, or she wasn't. Why in heaven's name would you wait eight years to get this case disposed of? Well, as I explained, Judge, she continued to treat after that. She had another surgery after that. She continued to have treatments, testing, MRIs, CAT scans, X-rays, which showed continued damage in her neck and in her low back and in her shoulders, actually both shoulders at that point. She also had subsequent comp claims filed, didn't she? She had a subsequent comp claim, one of them filed November 26, 2001. And she fell on her knee on the ice or something? No, Judge. She fell off the truck, I think. No, I'm not talking about the comp claim. I'm talking about the other one. What other one, Judge? She had another injury that was noted in the doctor's records that she claimed she fell down on the sidewalk. Yeah, she tripped and fell and re-injured the same knee, the right knee. February 7, 2010, I think was the date. In this decision denying the petition, the commission pointed out that the claimant had continued her return to work at full duty following the initial arbitration hearing, had not continued any medical treatment for her conditions until the subsequent accidents. So what's your response to that? Well, Judge, the subsequent accident is an empty chair defense, a red herring defense, because if you look at the record, the November 26, 2001 accident, there's not one documentary record, not one medical record of an injury. That was a protective filing on my part in case it turned out to be a substantial injury. It turns out it was not a substantial injury. There's no emergency room record after that last accident. There's no doctor's reports. There's no evidence of doctor's treatment after November 26, 2001. There's no x-rays, no MRIs, nothing to support that that intervening claim is as substantial as the commission and the city have made it to be. It was just a protective, prescriptive filing that was never pursued because there's no substance to it. There's no documentary evidence. Now, it is mentioned over and over again in the record, no question, but there's no supporting documents. There's no medical evidence that she ever treated after that. And, by the way, she continued to work from November 26 to February 1, 2002. When she stopped working, she has testified that, in her opinion, all of her subsequent treatment was from the first four accidental injuries from 97 to 2000, not to the November 26 one. She placed it all on her treating physician, Dr. Bernard Coniglio, who was an internist who treated her for 15 years, who has also testified that it was those first four accidents that led to her subsequent injuries and disabilities. Right. Coniglio clearly testified to claiming it was permanently and totally disabled. The other side had the opinion of Dr. Gleason. He offered the opposite conclusion, and the commission chose to believe Gleason. So why couldn't they do that? Well, because Dr. Gleason gave her light duty. And Pam Nelligan, the vocational expert for the city, gave her a job search, a labor market survey, for sedentary work. And of the 33 labor market survey jobs she found, like gate guard and such, only nine of them even panned out that they were available. On top of that, she would have earned something like $8.65 or $9 an hour on any of those sedentary jobs. So there was never really a meeting of the minds. Dr. Coniglio testified she was permanently and totally disabled. He wrote that many times to the city. Dr. Kahle testified she was permanently and totally disabled. Our vocational expert, Susan Entenberg, testified that she could not perform any substantial gainful employment. There was no stable wage labor market for her. I don't think Entenberg testified to that. Entenberg testified that until she got releases from the doctors, she couldn't perform a labor market study. That's true. Well, that's a little different than what you said. No, that was part of what she said. She was relying on Dr. Coniglio's fact that he never released her to return to work. But she also testifies that this woman had to lie down two hours a day and that there would be no stable labor market for someone who had to do that because of all the pain problems she had. Well, you referenced Dr. Kahle. But didn't Dr. Kahle also admit that he did not believe that the claimant was unable to perform all types of work, but simply she could not perform her duties as an asphalt helper? Didn't he testify to that? All the witnesses testified to that, yes, Judge. But he also said she was permanently and totally disabled. And he also related it back to the first four injuries, not the mystery fifth injury that really wasn't much of anything, although it started out to be a big defense, and I call it an empty defense. Well, what did Kahle write? I'm sorry, Judge. Did Kahle issue a report saying the November 26, 2001 accident had caused injuries to her shoulders, lumbar spine, and cervical spine? Did he write a report saying that? No, he did not, Judge. I think he did. I don't. I think the record contains one. I don't think he testified to that at all. I think it contains a report dated April 2007 where he writes that the November 26, 2001 accident had caused the injuries to the claimant's shoulders, lumbar spine, and cervical spine. When he testified, he included all four injuries plus that one, Judge. He didn't limit it to that one. As I recall in his testimony, it's in the record. In any event, I think we've proven a material and substantial change in condition, which is the test under 19H. Certainly this woman who was working as an asphalt helper until February 1, 2002, suddenly could do nothing further. She had multiple surgeries, and even after the multiple surgeries, I think the last one was in 06, even after that, she had multiple tests which showed further damage in her neck and in her low back. She's testified credibly, and Dr. Coniglio corroborated it, that she needs more cervical surgery, which she refuses to have. She's been through so many surgeries. She testified she just does not want to submit herself to any further surgery. She also needs a right knee replacement. The judge properly points out that some of that damage to that right knee could well have been from the trip on the sidewalk. But certainly before that trip in 07, she'd had two knee surgeries and lots of knee damage. So there was, you know, the process had already begun. It may have been further aggravated by a slip on the curb or the trip and fall, whatever it was. In my brief, I've demonstrated that right down to 2012, she was getting MRIs. She had a nerve conduction study by Dr. Cohen at Chicago Neurology, which found nerve damage from her C5 area. So there's plenty of corroboration that her complaints, which are voluminous, I put those in my brief, are substantiated by objective medical evidence and by the testimony of the parties. Now, with respect to the judge's question about release, doctor, we're claiming a permanent total because we have met our burden, according to CECO, C-E-C-O case, that considering this woman's age, which is now 60, her education, high school education, her prior work, which was heavy, unskilled labor. What do you do with Nelligan's opinion? Pardon me, Judge? What do you do with Nelligan's opinion? Nelligan said light to sedentary. Nelligan said she could work. She said that she actually did contact employers, and there were a series of employers who said they'd hire a woman in her condition. Judge, that was a labor market survey. Nothing was ever done to place this woman. Well, what would attempt to do? If the commission believes Nelligan, she's not a permanent total. Under an agla theory, there are jobs for her. And that was Nelligan's opinion. Well, you can do a survey, and it can tell you what jobs are out there, but unless you place the person... Counsel, I didn't say the commission had to believe Nelligan. I just said they did. She testified light to sedentary work. Well, if your client can do light to sedentary work, she's not a permanent total. Not really, because there's been no meeting, there's been no attempt to place this woman either within the city or outside the city. I mean, a labor market survey, to me, is just a study. This might be out there, but most experts, after that, try to place the person. Nelligan wrote a report concluding that she was employable. She conducted a labor market survey for targeted greeter information clerk gate guard positions, and of 33 prospective employers she contacted, 15 employers indicated they would accommodate the claimant's restrictions. If that's the case, and the commission believed her, you haven't got a permanent total on your hands. But, Judge, she didn't have any transferable skills. She had no computer skills. I think Nelligan didn't place her because she knew that Dr. Caniglia... Counsel, I'm not suggesting to you the commission had to believe Nelligan. But what I'm telling you is they did. And if they did, why is it against the manifest way to the evidence? Well, the petitioner's testimony, her doctor of 15 years who had been treating her constantly, knew all of, I think, the dissenting commissioner, Commissioner Tyrrell said... Are you talking about Cale? He was the quarterback. Are you talking about Cale? No, Tyrrell. The doctor. I'm talking about the doctor. Which doctor did you say gave her an opinion that she was a permanent total?  No, Caniglio, Bernard Caniglio. And what did Caniglio say when he was questioned about his opinion? He said she was permanently a totally disabled. He wrote that off. She couldn't do her job. Cale talks about it and says he believes she can't do her job on the asphalt work, but he admits that she wasn't permanently disabled for all types of work. He was addressing her capacity to do the asphalt job. So even your own doctors suggested she could do some work. Judge, there were no transferable skills from heavy asphalt. Considering this woman's age, her prior work history of hard, heavy, unskilled labor... No question she can't be an asphalt worker again. We know that. We've always known that. When that happens, the burden shifts to the employer to find suitable gainful employment. Now, they tried once. In July of 2005, they put her back to work hanging signs for a day and a half. No, the burden doesn't shift to the employer until you come forward with evidence that she's incapable of gainful employment. Your own doctor said she could do it. Your own doctor, who you rely on, admits that she can walk, she can talk on the phone, she can sit for periods of time, she can drive, she can read and she can write. Yes, but he also says she's permanently and totally disabled. In connection with your burden-shifting argument, did you submit evidence of a diligent but unsuccessful job search? She did not take any. She was not released by her doctor. That is another problem to an ad-hoc permanent total. You didn't do that either, right? She did not do that because she wasn't released to do it. And then Nelligan said that the stable market existed for her. On a labor market survey, but no attempt to really place her. Is that the test? A VOC expert disagreed vehemently with Nelligan, as you know, because a VOC expert said that this woman had no transferable skills, one, and B, her doctor, her family doctor, her internist had not released her to any form of work, and C, she was so restricted from having to lie down for several hours a day that there was no stable labor market available for her. And that's believable testimony when you look at the totality of the rate. Your expert, Ms. Entenberg, admitted she was unaware that Dr. Ahn released the claimant to work with restrictions in August of 2003, or that Dr. Tonantino released her to work on an unrestricted basis in May of 2006. Now, Entenberg is coming up with opinion. The problem I have with Coniglio is his opinion that she is medically unable to work, or is he giving an opinion as a vocational consultant? I think mostly medically, but I think he knows her vocation, so there's probably... He can't testify as a vocational expert. We have cases on it. He is a doctor. He can only testify if a person is medically unable to work. There has to be a medical reason why they can't work. He wrote those scripts repeatedly, and he testified that she was medically unable to work. Counsel... On top of that, Judge... Counsel? Yes. Your time is up. You've gone beyond. You'll have five minutes in reply. Can I make one last response on that? Okay. Okay. You may respond. Good morning, Your Honors. My name is Nancy Shepard, and I represent the defendant, Sadee Ishiguro. Good afternoon. Oh, good afternoon. It's the city's position here today that the decision of the Illinois Workers' Compensation Commission should be affirmed in its entirety. The case before you is a petition from the plaintiff under 19H, and the commission correctly found that her current condition of ill-being is not related to the four previously tried cases, and they further found that there had been no material change in her condition as a result of those four cases. Let me ask you a question. Yes. There is still one accident out there that has not been tried? There's actually two cases out there that have not been tried. One involves a finger, and the other is the November 26, 2001 claim. So from an original trial standpoint, you're going to go through all this again, right? There's a decent chance of it, yes. Can I ask you a question? Yes. How do cases remain pending at the Industrial Commission from 2001 to 2015 with nobody doing anything about it? Well, I believe in this case one of the reasons why it took so long is because there were multiple cases pending. There were the 19H cases pending, and then there's also the November 26, 2001 case pending, and I think it's up to the petitioner to help move those cases along depending on what their theory of the case is going to be. And it sounds like his theory of the case is that it's all related to these four prior claims, and that 2001 claim remains pending. Could you speak up just a little bit? Yes, I'm sorry. It goes above the red line. It is well above the red line. So, you know, I'm just being number one. It does come before the arbitrator every three months. I don't know where it is in that cycle. I'm not the attorney handling that claim. This decision of the commission is not against the manifest weight of the evidence. It's a question of fact. I think that was touched on a little bit here today, and the parties agree that that's the proper standard of review here before you today. There are four claims of accident in this matter. One involved the right shoulder, the right knee, the cervical spine, and the lumbar spine. All of these claims were previously tried, and all of these body parts received permanency before the arbitrator. Dr. Coniglio indicated, in his opinion, of course, that the claimant was permanently and totally disabled, right? He did. Will you make an opposing counsel's argument that no attempt was made to place the claimant in any judgment? I don't think that the- Is that relevant? Is that a red herring? I think that's a red herring. I think at the end of the day the plaintiff has the burden of proving whether there was a stable labor market available for the plaintiff as she stood. I also think that it's a red herring in the sense that whether her condition is permanently- whether she is permanently and totally disabled is only relevant if we determine that that change in her condition is related to the four previously tried cases. As the commission found, if it's not, then whether she's permanently disabled, can work, can't work, is not even really relevant to the cases that you have before you here today. I think the most important thing here today is that there simply was no medical provided for a very vast majority of time to counter the findings and the holdings of the commission. The last medical record provided at the arbitration hearing was in June of 2000. The next medical record that's provided in the 19-H hearing isn't dated for two more years, and that's the cervical fusion operative report. There's no medical provided to this court leading up to the cervical fusion. There simply is a cervical fusion. The last medical note regarding her cervical spine is in May of 2000. There's a three-year gap between the next medical record involving her cervical spine and the other body parts have even larger gaps. The knee has a four-year gap. The lumbar spine has a three-year gap. The first lumbar spine record presented in this case before you after the arbitration hearing is an MRI. None of the medical records leading up to the MRI were provided to you. The right shoulder is very similar. There's a four-year gap in treatment. Following the cervical fusion operative report, the next medical record that was provided to you in your record is a left shoulder surgery operative report. The left shoulder isn't even part of this case. The left shoulder was injured in the 2001 accident, which petitioner was arguing was a red herring and not a real accident, but she subsequently had surgery as a result. I think the evidence here today clearly supports the Commission's decision that if there was a change in condition, it's not related to the four cases, in which case there's no additional medical benefits to be awarded on this case. There's no additional permanency, whether that's per total or not. It simply isn't related to this claim. Okay. Thank you, Counsel. Counsel, you have five minutes in reply. I just want to address, I think, Judge Hoffman's statement about Dr. Howard Ahn, who did the cervical fusion. He did release Donald Halters, but with permanent restrictions. It's in the record of no lifting more than 15 or 20 pounds. Dr. Mara, who did the shoulder surgery, put a 25-pound permanent restriction and said lift 25 occasionally. So there were already restrictions on her work activities, but no attempt to accommodate those restrictions by her employer. With respect to counsel's talking about a gap, she says there was a three-year gap. I think it's two years from 2000 to 2002. On April 26th of 2002, Dr. Ahn, who had treated her cervical condition before the arbitration awards and had diagnosed a herniated cervical disc at C3, C4, did the cervical fusion at the very same level. So there's very clear evidence that she returned to the same orthopedic surgeon, and he operated on the same part of her body that she had previously injured in the pre-arbitration accidents. The same basic situation occurred with the lumbar. And some of this ongoing treatment relates to why it took us so long to get to hearing on this matter. I think that concludes my rebuttal. Thank you, judges. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement and written disposition shall issue.